## The Detroit Savings Bank v. Jane E. R. Burrows.

*Banks: Deposits: Adverse claimant: Notice to depositor: Defense.* A bank sued by an adverse claimant to money deposited with it, is under no obligation, after having given the depositor timely notice of the proceedings and of the facts on which they are based, to make a strenuous and persistent defense, or to resort to any measures to prevent the cause being brought to trial according to the regular course of the court; the implied obligation of a bank to its depositor to protect the interests of the latter do not go beyond the requirement of good faith in refusing to surrender the moneys confided to its custody except upon a lawful demand lawfully established.

*Bankers: Depositors: Claim by third person: Notice to depositor: Negligence.* Where the depositor and her attorney had ample notice of the bringing of a suit by another against the bank to recover the deposit, and her agent was present at the trial, failure by the bank to notify such depositor's attorney of the time of the trial, such notice not having been requested, is no breach of duty or evidence of negligence on the part of the bank.

34 MICH.—20.

DETROIT SAVINGS BANK *v.* BURROWS.

*Negligence: Application for continuance: Evidence.* An omission to apply for a continuance until such depositor should be present to take part in the trial, is held, under the circumstances of this case, not to be negligence on the part of the bank.

*Negligence: Evidence: Motion for new trial: Burden of defense.* Nor was the failure to move for a new trial upon facts communicated after the verdict to the bank officers and attorney by the depositor's agent, who was present at the trial, negligence. The burden of the defense rested on the depositor and not on the bank, and if a new trial was to be moved for, the duty of taking the necessary steps was upon such agent, instead of awaiting the action of a mere custodian having no interest in the dispute.

*Collusion: Evidence: Costs: Prompt payment.* The failure to tax costs after judgment in the suit against the bank, and the statement of the plaintiff's attorney in his precept for execution that "the defendant preferred to have an execution, and both parties want it done at once," and the prompt payment of the judgment by the bank, are held not evidence of collusion between the parties to the suit.

*Banks: Deposits: Payable to order of third person: Debtor and creditor.* The query is suggested, but not decided, whether where moneys are deposited by one on an understanding with the banker that all orders drawn against the deposit are to be to the order of another, the ordinary relation of debtor and creditor is established between the depositor and the banker, or whether such deposit does not leave it open to be determined as a question of fact under all the circumstances whether the money was understood to be deposited to the use of the one or of the other, or for the joint use of the two who were to act in drawing it out.

*Heard April 19. Decided June 6.*

Error to Superior Court of Detroit.

*John H. Bissell, John Atkinson* and *W. P. Wells,* for plaintiff in error, argued, among other things, that the effect of the whole charge was to submit the case to the jury upon the basis substantially of an ordinary deposit made by Mrs. Burrows in her own name and payable to her, while in legal effect the condition that the money should be paid only to the order of Mr. Burrows made it payable to the latter, and that his endorsement of the checks was not a mere mode of withdrawing the money, but a part of the very contract of deposit out of which the liability of the bank to pay the money arose: *Dacy v. N. Y. Chem. Man. Co.,* 5 *Hall,* 550; *Fulton Bank v. N. Y. & Shar. Canal Co.,* 4 *Paige,* 127; *Morse on Banking,* 279; that the judgment in the action of Keays against the bank, the plaintiff in the suit at bar having

had timely notice to defend the same, constituted a bar to her recovery in the present action; that the case comes within the class of cases where a judgment against one party is held to bind another who has notice to defend; that personal judgments conclude the parties to them and their privies: *Bigelow on Estoppel, 46;* that the legal privity which makes the judgment binding on the privy is defined as mutual on successive relationship to the same rights of property: *Greenl. on Ev.*, §*189; Bigelow on Estoppel, 75; Freeman on Judgments,* § *162;* that its indisputable applications are to cases of vendor and vendee *(Thurston v. Pratt, 52 Me., 202),* of bailor and bailee *(Tarleton v. Johnson, 25 Ala., 300),* and other cases; that the principle is, that a defendant by giving notice to one who is bound to defend makes the latter a privy to the suit, and the opportunity of defense being afforded, the judgment concludes him: see 2 *Phillips on Ev. (Edwards' Ed. 1859), 7, 131, notes, 252, 292;* 2 *Smith's Leading Cases (Ed. 1873), 801, 802, note to Duchess of Kingston's case; Guidrey v. Jenneaud, 25 La. An., 634;* and that the case of a bank, called upon to defend the title to a deposit against the claim of a third person, and giving the depositor notice to defend, is clearly within the principle.

*Moore & Griffin* and *F. A. Baker,* for defendant in error.

COOLEY, CH. J:

The facts out of which this controversy arises appear to be the following:

In the fall of 1874 Charles Burrows, the husband of Jane E. R. Burrows, deposited at different times with the Detroit Savings Bank sums which aggregated six thousand seven hundred and twenty-one dollars and ninety cents. On October 12th, 1874, Burrows made a general assignment to one Keays for the benefit of creditors. This assignment was

made in Canada, where Burrows had resided and carried on business. Four days after this assignment he called at the bank and drew out all the money standing to his credit, the officers of the bank not being then aware that an assignment had been made. November 2d, 1874, Burrows again appeared at the bank with seven thousand three hundred and seventy-two dollars, which he deposited to the credit of his wife. At the same time he delivered to the bank a paper on which his wife's name was twice written by her, and informed the receiving teller that all checks against the deposit then made were to be drawn to his order. The teller thereupon wrote on the paper on which were Mrs. Burrows' signatures the following words: "All checks will be drawn to order of Charles Burrows." The paper was then pasted into the depositor's signature book, where it afterwards remained. When Mr. Keays ascertained what had been done by Charles Burrows at the bank, he instituted suit against the bank to recover the moneys on deposit, claiming that they had belonged to Charles Burrows, and were transferred to Keays by the assignment. This suit was begun December 23, 1874. Previous to this, however, Mrs. Burrows had drawn out five thousand two hundred and ninety-two dollars, and had gone into the southern states. All her checks had the endorsement of Charles Burrows, except one of forty-two dollars. January 13, 1875, Mrs. Burrows, not being then aware of the suit by Keays, wrote the bank, from Galveston, Texas, enclosing her check for five hundred dollars, not endorsed by her husband, and requesting New York exchange for the amount. January 18, 1875, Mr. Miller, the attorney for the bank, answered her letter, returning the check, and saying: "The check cannot be paid, because your written instructions to the bank are to pay nothing except to the order of Charles Burrows. It is proper to state to you that suit has been instituted against the bank by some person claiming to be the assignee of Mr. Charles Burrows, alleging that the money belongs to him, and that the bank owes it to him. It will therefore

be necessary for you to see that your rights are protected by counsel here. The bank cannot assume any expense in defending the case." On receipt of this letter (but on what precise day is uncertain), Mrs. Burrows wrote to Mr. Moore, a member of the bar in Detroit, advising him of the suit, asserting her exclusive right to the moneys, and saying: "I will thank you to call upon the manager of the Detroit Savings Bank and protect my interest." Mr. Moore received this letter about February 24, 1874. He immediately called on the cashier of the bank and ascertained the condition of the claim and of the suit. He also called on Mr. Miller and Mr. Bissell, then acting for the bank as attorneys in the Keays suit. Being interrogated as to whether he directed the firm of which he was a member to look to the interest of Mrs. Burrows in the transaction, he replied: "I didn't assume any responsibility at the time in relation to it. If you will permit me to state what took place, I said to Mr. Miller, I know nothing about this transaction; you can defend, and you had better defend, or something of that kind; that is, saying he knew all the facts and he could defend to better advantage for her than any body else; I did not assume any responsibility about it." He added that he did nothing further in relation to the suit except to write Mrs. Burrows fully, under date of February 24, 1875, stating the facts in regard to the suit; intimating that the deposit by Burrows under the circumstances in his wife's name, but payable to his order, was suspicious, though subject to explanation, and concluding as follows: "It will be necessary for you, however, to see that a defense is interposed, in order to prevent their getting possession of the money. Will you please state on the receipt of this what you can show about your ownership of the money, and when you may probably be here to make such proof as may be necessary?" This letter was answered by Mrs. Burrows from Vicksburg, Miss., March 26, 1876, the answer stating that she received the letter in Cuba, and should be home in a few days to explain all.

Mrs. Burrows appears to have had another agent in Detroit with some authority to look after this suit for her. · This was George J. Stocks, to whom both Mr. and Mrs. Burrows had written on the subject. Stocks called on Mr. Bissell and communicated with him in regard to the suit, and he was present at the trial, which took place March 23, 1874. For some purpose which is not explained Stocks was called as a witness for Keays, and was cross-examined at length by Mr. Bissell. It does not appear that Stocks, or any one else, on behalf of Mrs. Burrows, took any steps to procure a continuance of the cause. Keays obtained a judgment against the banks upon which an execution was taken out the next day, without taxing any costs, and the amount was immediately paid. Stocks testified that after the trial he had a conversation with Mr. Bissell, and put him in possession of certain important facts, which, however, are not set forth in this record. This testimony was put in as having some bearing on the question of diligence on the part of the bank in making defense; it being conceded that no steps were taken on the part of the bank to· obtain a new trial.

When Mrs. Burrows returned and found that judgment had been obtained against the bank and had been paid, she employed an attorney and proceeded to the bank to make demand for the money. For this purpose she drew her check for two thousand and eighty dollars, payable to the order of the attorney, and the attorney presented it. The bank refused payment, and this suit was then brought.

In submitting the case to the jury the judge was requested to instruct them that on the evidence the plaintiff was not entitled to recover, but this was declined. He was also requested to instruct them that there was no evidence tending to show collusion between Keays and the bank, and that the jury would not be justified in inferring it; but this was also declined. The question whether the money really belonged to Mrs. Burrows was submitted on conflicting testimony. And the instructions left the jury at liberty to infer negligence on the part of the bank in defending the

Keays suit, if they should be of opinion that negligence was shown.

In order to determine what evidence of negligence there was for the jury to act upon, it is necessary to consider what the officers of the bank did and what they refrained from doing. They certainly do not appear to have entered into a strenuous and persistent contest with Keays, or to have resorted to any measures to prevent the cause being brought to trial according to the regular course of the court. But were they bound to do so, and if so, on what grounds? Certainly not from any pecuniary interest in the controversy, for it was legally a matter of indifference to the bank whether the moneys should be paid to Keays or to Mrs. Burrows. Moreover the latter had not in any way indemnified the bank for contesting the claim of Keays, and the defense, so far as appears, was being conducted at its own expense. There were no peculiar obligations resting upon the bank to protect the interest of Mrs. Burrows, except such as must be implied in the case of every depositor; and these do not go beyond the requirement of good faith in refusing to surrender the moneys confided to the bank except upon a lawful demand lawfully established. Indeed, there were in this case some presumptions against the claim of Mrs. Burrows, that were very well calculated to favor the claim of Keays in the mind of any one familiar with the facts; presumptions springing from facts which the attorney of Mrs. Burrows had very properly informed her looked suspicious. It is not at all unlikely that the officers of the bank regarded the claim of Mrs. Burrows as unfounded, and possibly they were influenced by some impressions to that effect in abstaining from a more vigorous and determined defense.

It appears, however, that the bank officers notified Mrs. Burrows of the suit in time to enable her attorney and her agent to take steps to make defense in her behalf if they deemed it advisable. It is fully shown by the evidence, that both the attorney and the agent had conferences with

the officers of the bank in regard to the suit, and it is not charged that information of any facts important for them to know was kept back. It is said the attorney was not informed when the cause was to be tried, but it is a sufficient answer to any complaint on that score, that he did not request or desire to be informed, but expressly left the whole matter in the hands of the attorneys for the bank. Moreover, the agent of Mrs. Burrows was informed of the trial, and it was his business, rather than that of the bank, to notify Mr. Moore if his presence at the trial was desired. It may be said the bank should have procured an adjournment of the case until Mrs. Burrows should return, and it is certainly remarkable that no continuance was applied for. But if there was any negligence in not making such an application it was, presumptively at least, not the negligence of the bank, but of the agent, Stocks. Stocks might perhaps have made the necessary affidavit of merits for a continuance, but there is no showing or intimation that any one connected with the bank could have done so. What they knew of the facts was this: A bankrupt who had a few days previously drawn a large sum of money from the bank, to which he had no right either legally or morally, had made the deposit in dispute in the name of his wife. At the same time he had made provision for securing to himself the benefit of the deposit, by directing that payments should be made only to his order. The bank might very well believe that presumptively this arrangement was a device in fraud of the bankrupt's creditors; and while the circumstances mentioned would by no means be conclusive on that point, they would be sufficiently strong to make one who knew nothing more of the facts than this hesitate to make oath to a belief in the justice of Mrs. Burrow's claim, or to either Mr. or Mrs. Burrows being able to testify to facts which could support it. But it is not necessary to discuss this. It is sufficient to say that the application for delay ought properly to have come from

Stocks rather than the bank, and that the former, if any one, ought to have been able to make the necessary affidavit for moving successfully.

It is not claimed that the bank kept back any facts on the trial. It is suggested, however, that there was negligence in not making use of the facts communicated by Stocks to Bissell as the foundation for an application for a new trial. But here the question arises, whose duty it was to move for a new trial. The argument on this branch of the case appears to assume that the bank, because it had been made by one party the custodian of a fund which another claimed, was bound to take upon itself the whole burden of the contest on behalf of the party from whom the fund had been received. But nothing could be more unreasonable or more inequitable. The burden of defense properly rested upon Mrs. Burrows; if any new trial was to be moved for after the verdict, her agent should have taken steps for that purpose instead of awaiting the action of a custodian which could have no interest in the dispute.

But the statement of Stocks on this branch of the case is somewhat singular, to say the least. He was put upon the stand as a witness by Keays, and was cross-examined at considerable length. If he knew any facts which would benefit Mrs. Burrows, it is most extraordinary that he did not divulge them there, instead of waiting to make them the ground for a new trial. Nay, it was extraordinary that he did not previously put Mr. Bissell in possession of them, so that the latter might prepare for trial with such aid as the facts might afford him. So far as we can see, the charge of negligence justly lies not at the door of any one connected with the bank, but at the door of Stocks, who neither as agent for Mrs. Burrows, nor as witness against her, was impelled to make that complete disclosure which the interest of his principal and the cause of justice would appear to have demanded of him in both capacities.

There is a like entire absence of evidence of collusion between the bank and Keays. The only specific facts to

which we are pointed as evidence of collusion are the following:

1. No costs were taxed for Keays on his judgment against the bank.

2. The attorney for Keays called for execution immediately, stating in his precipe that "the defendants in the case prefer to have an execution in the case. Both parties want it done at once. Please see to it right off, as it is quite important to both parties to avoid delay."

3. The conversation between Stocks and Bissell after the trial, in which the former claims to have communicated important facts, of which Bissell made no use.

4. The prompt payment of the money by the bank.

What the attorney for Keays may have said is manifestly not evidence against the bank, and may be dismissed from consideration. The communication from Stocks to Bissell seems to call for no further remark than this: that if it evidences bad faith in any one it would be in Stocks rather than in Bissell. The other facts which are relied upon at the utmost prove nothing more than that the bank and Keays were trying in an amicable suit the right of the latter to the money which the former held. There was nothing suspicious in this; it was entirely proper that the suit should be conducted amicably, and proper also that if the bank interposed no technical or vexatious defenses, and allowed the case to come to a hearing on the merits according to the ordinary course of the court, no costs should be taxed against it. In justice no costs ought to have been taxed.

Collusion in such a case implies a secret or dishonest arrangement in fraud of the rights of another. In this case it might have been shown either,

1. In keeping Mrs. Burrows in ignorance of the proceedings until judgment should have been obtained; or,

2. In concealing or in mis-presenting the facts upon which the trial was to be had.

We do not learn that either the one thing or the other is chargeable to the bank in this case. Mrs. Burrows was

DETROIT SAVINGS BANK *v.* BURROWS.

actually represented at the trial by her agent, and the only concealment of facts that is shown was by the agent himself. Whether the facts concealed were material we cannot say, as we have only the word of Stocks for it; but assuming that they were, they do not charge the bank with either *mala fides* or negligence.

A careful examination of the record leads us irresistibly to the conclusion that the judge erred in not charging the jury that on the facts the plaintiff below was not entitled to recover. The judgment must therefore be reversed, and a new trial ordered.

We have not deemed it proper to discuss the question whether when moneys are thus deposited by one person on an understanding with the banker that all orders drawn against the deposit are to be to the order of another, the ordinary relation of debtor and creditor is established between the depositor and the banker. Had the understanding been that the husband himself should draw for the money, probably he must have been considered the creditor.—*Lilly v. Hays, 5 A. & E., 548; Malcolm v. Scott, 6 Hare, 570.* But this case was peculiar in that the action of both wife and husband was requisite to draw out any moneys under the directions given. We have found no case which undertakes to explain what the legal position of the parties is under such an arrangement, but we should say that the most Mrs. Burrows could claim would be, that it was a question of fact under all the circumstances whether the money was understood to be deposited for her use, or for that of her husband, or for the joint use of the two who were to act in drawing it out.—*Gibson v. Minet, R. & M., 68; S. C., 1 C. & P., 247.*

GRAVES and MARSTON, JJ., concurred.

CAMPBELL, J., did not sit in this case.